UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARYL B. SPRINGER,

      Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

Case No. 18-cv-12705
Hon. Matthew F. Leitman

_____/

### OPINION AND ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 16), (2) DENYING THE COMMISSIONER'S MOTION FOR SUMMARY JUDGMENT (ECF No. 19), AND (3) REMANDING FOR FURTHER PROCEEDINGS

In this action, Plaintiff Daryl B. Springer alleges that Defendant Commissioner of Social Security wrongly denied his application for Social Security disability benefits. (*See* Compl., ECF No.1.)  Both parties have filed cross-motions for summary judgment. (*See* Springer Mot. for Summ. J., ECF No. 16; Comm'r Mot. for Summ. J., ECF No. 19.)  For the reasons explained below, the Court **GRANTS IN PART AND DENIES IN PART** Springer's Motion for Summary Judgment (ECF No. 16), **DENIES** the Commissioner's Motion for Summary Judgment (ECF No. 19), and **REMANDS** for further proceedings.

# I

## A

On June 5, 2013, Springer filed an application for disability benefits under Title II of the Social Security Act (the "Initial Application"). (*See* Initial Application, ECF No. 12-3, PageID.155; Initial Application Summary, ECF No. 12-5, PageID.215.) Springer alleged that his period of disability began on June 8, 2012. (*See* Initial Application Summary, ECF No. 12-5, PageID.215.) Springer claimed that he suffered from several disabling conditions, including:

- Discogenic and degenerative back disorders;
- A fractured vertebrae column with a spinal cord lesion;
- Gastroesophageal reflux disease ("GERD");
- Anxiety;
- Right hip pain; and
- Excessive daytime sleepiness.

(*See* First ALJ Opinion, ECF No. 12-2, PageID.61; Initial Application, ECF No. 12-3, PageID.155.) On October 17, 2013, the Social Security Administration (the "SSA") denied the Initial Application. (*See* First ALJ Opinion, ECF No. 12-2, PageID.58.)

## B

On October 21, 2013, Springer filed a written request for a hearing on the Initial Application before an administrative law judge (an "ALJ"). (*See id.*) That

hearing was held on January 12, 2015 (the "First Hearing"). (*See id.*; 1/12/15 Hr'g Tr., ECF No. 12-2, PageID.78–137.) Springer testified as follows at the First Hearing:

- He had a bachelor's degree in elementary education and a master's degree in educational administration. (*See id.*, PageID.86.)

- Starting in 2000, he taught sixth grade social studies and eighth grade U.S. history. (*See id.*, PageID.88–89.) He also taught a graduate school course on social studies methods and worked as a middle school basketball and track and field coach. (*See id.*, PageID.90–91.)

- He stopped working in June 2012 because of extreme back pain. (*See id.*, PageID.93.) He felt that he was unable to work "[b]ecause I can't sit. I can't stand, can't walk, stoop, I can't twist, I can't bend without pain. And the pain is so much that I just – I can't focus on other things." (*Id.*, PageID.118.) He said that, by the end of his career, he was taking up to 18 sick days per year, was "constantly in pain," was "having a hard time organizing things," and had "to lie down on the floor during class." (*Id.*, PageID.110, 112.)

- He was in a skiing accident in 1996, which caused several compression fractures in the thoracic region of his spine. He had recently suffered another compression fracture after he experienced a "small fall." (*See id.*, PageID.107–108.)

- On a pain scale of 1 through 10, his pain "never goes below a 3 or a 4," and sometimes his pain would "flare up to 7, 8." (*Id.*, PageID.121.)

- On a daily basis he took MS Contin and Zanaflex for pain, Omeprazole for acid reflux, Adderall for sleepiness, and Neurontin for nerve pain and

his mental health issues. (*See id.*, PageID.122–123, 125.)  Occasionally he took Norco when he experienced breakthrough pain. (*See id.*)

- He had not undergone back surgery because his doctors recommended surgery only as a last resort. (*Id.*, PageID.108.)

- His twelve-year-old daughter from a prior marriage lived with him every other week.  Otherwise, he lived alone. (*See id.*, PageID.84.)  He lived in a two-story house, but it was too difficult for him walk up the stairs to the second floor. (*See id.*, PageID.85.)

- He drove "very little" unless his daughter was staying with him, in which case he drove her to school and back. (*Id.*, PageID.97.)

- On a typical day, he: made sandwiches for his daughter's lunch when she was staying with him, but he had "to do it in stages because it's really difficult for me to just stand"; performed – depending on the level of pain he was in – "minor chores" around the house; laid down "often" to stretch and perform his physical therapy; watched TV; and read. (*Id.*, PageID.100)

- He typically slept "four or five hours" a night because the "pain just wakes me up all the time." (*Id.*, PageID.102.)

- Depending on his pain levels, he had to stand up and stretch every one to every five minutes. (*Id.*, PageID.118.)

- Because of his pain, he no longer showered daily.  He relied on friends to help with tasks such as laundry and housekeeping, and he taught his daughter how to do most of their cooking. (*Id.*, PageID.103.)

- He suffered from anxiety and depression.  Doctors from Michigan Neurology prescribed him medications for his mental health. (*See id.*, PageID.109–110.)

- "Nearly every one" of his medications caused him sleepiness. His medications and his pain occasionally caused him dizziness and diminished concentration. (*Id.*, PageID.114–115.) He frequently fell asleep in public places, while using the bathroom, and (when he had been working) during class. (*See id.*, PageID.119–120.) He recorded every TV show he watched "because I usually can't watch a show without falling asleep, or . . . focus on it." (*Id.*, PageID.119.)

- He used a cane to help walk since 2011. The cane was recommended by a doctor, but it was not prescribed for him. (*See id.*, PageID.116–117.)

A vocational expert (the "VE") also testified at the First Hearing. To guide the VE in her testimony, the ALJ described a hypothetical individual of Springer's age, educational level, and work experience, who had the following limitations:

> The person could only occasionally climb[] stairs, crouch or crawl, or kneel, or stoop, or bend. He would need to avoid working around hazards, which would be things like dangerous moving machinery, unprotected heights, or climbing ladders, or ropes, or scaffolding. *He would need some flexibility to change positions, like a sit/stand option.* The work should be something that's self paced or low stress; something that's simple and routine in nature.

(*Id.*, PageID.130–131; emphasis added.) The VE testified that the above-described hypothetical individual could not perform Springer's past relevant work as a teacher and coach. (*See id.*, PageID.131.) But the VE testified that the hypothetical individual "could perform light unskilled work" as a general office clerk, information clerk, or inspector. (*Id.*, PageID.131–132.) If the hypothetical

individual was limited to sedentary work, then he could find unskilled work as a general office clerk, information clerk, or order checker. (*See id.*)

<h2 style="text-align:center">C</h2>

On March 27, 2015, the ALJ issued a written opinion denying Springer's claim for benefits (the "First ALJ Decision"). (*See* First ALJ Decision, ECF No. 12-2, PageID.58.)  In the First ALJ Decision, the ALJ applied the SSA's five-step sequential analysis to determine if Springer was disabled. (*See id.*, PageID.60–73.) The five steps are as follows:

> **Step One:** Has claimant engaged in substantial gainful activity?  If not, move to Step Two.
>
> **Step Two:** Does claimant suffer from one or more severe impairments? If so, move to Step Three.
>
> **Step Three:** Does claimant's impairments or combination of impairments meet or medically equal the criteria of an impairment listed in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, claimant is disabled.  If not, move to Step Four.
>
> **Step Four:** Considering claimant's residual functional capacity, can the claimant perform his or her past relevant work?  If not, move to Step Five.
>
> **Step Five:** Considering claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?  If not, claimant is disabled.

*See* 20 C.F.R. § 404.1520.

At Step One, the ALJ found that Springer had not engaged in substantial gainful activity since he stopped working in June 2012. (*See* First ALJ Decision, ECF No. 12-2, PageID.60.)  At Step Two, the ALJ concluded that Springer suffered from the following severe impairments:

- Multilevel disc bulging;
- Degenerative disc disease with mild compression deformities of the thoracic spine; and
- Depressive disorder.

(*See id.*, PageID.60–61.)  At Step Three, the ALJ found that Springer did "not have an impairment or combination of impairments that [met] or medically equal[ed] the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (*Id.*, PageID.61–63.)  Thus, the ALJ concluded that Springer was not disabled at this step.

Prior to Step Four, the ALJ found that Springer had the residual functional capacity (the "First RFC") to perform "light work" with the following limitations:

> [C]laimant is limited to occasional climbing of stairs, crouching, crawling, kneeling, stooping, and bending. The claimant must avoid work that involves workplace hazards such as moving machinery, unprotected heights, and climbing of ladders.  In addition, *the claimant is restricted to a work environment that would allow him the opportunity to alternate between sitting and standing while engaged in work, as he desires*.  Furthermore, the claimant is restricted to work that is low-stress such that it is self-paced and involves only simple and routine tasks.

(*Id.*, PageID.63; emphasis added.)

At Step Four, based on the First RFC, the ALJ found that Springer was unable to perform his past relevant work as a teacher or a coach. (*See id.*, PageID.71–72.)

Finally, at Step Five, the ALJ – relying on the VE's testimony and the First RFC – found that Springer could work as a general office clerk or as an inspector, and that these jobs existed in significant numbers in the national economy. (*See id.*, PageID.72–73.) Thus, the ALJ found that Springer was not disabled. (*See id.*, PageID.73.)

## D

Springer sought review of the First ALJ Opinion in this Court on February 25, 2016. (*See* Initial R&R, ECF No. 12-10, PageID.725.) On June 22, 2017, the assigned Magistrate Judge recommended that the Court grant Springer's motion for summary judgment and remand the matter to the ALJ. (*See id.*, PageID.724.) The Magistrate Judge concluded that the First RFC determination was not supported by substantial evidence. (*See id.*, PageID.730.) According to the Magistrate Judge, the sit/stand option that the ALJ described in her hypothetical to the VE differed from the sit/stand option that the ALJ described in her determination of the First RFC:

> [T]he ALJ's hypothetical to the VE at the hearing provided, among other things, that Plaintiff "would need *some flexibility* to change positions, like a sit/stand option." . . . Then, within the Step 4 RFC determination, the ALJ provided for "the opportunity to alternate between sitting and standing while engaged in work, *as he desires.*"

Finally, at Step 5, the ALJ noted that the VE's testimony was based, in part, on "the testimony about a sit-stand option . . . ."

\*\*\*

Here, the sit/stand option in [the] ALJ's hypothetical – only modified by the words "some flexibility to change positions" – was generic, and the Step 4 RFC's "opportunity to alternate between sitting and standing while engaged in work. . ." was more restrictive in that it was modified by "as he desires[,]" – an equivalent of "at will." "Some flexibility" and "as he desires" are not the same. While the RFC contained a condition with a maximum restriction, the hypothetical on which the VE based her opinion as to available employment did not.

\*\*\*

In the end, as was the case in *Ferguson*, "[i]f the ALJ believed that Plaintiff required a sit/stand *at will* restriction, his failure to include it in the hypothetical question invalidates the VE's job findings." *Ferguson*, 2013 WL 530868, at \*6 (emphasis added). Thus, the Court should agree with Plaintiff that the above-described difference between "the ALJ's actual written determination" and "the VE's testimony" renders the VE's testimony "something less than substantial evidence, warranting remand." "[A]t step five of the inquiry, which is the focus of this case, the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones*, 336 F.3d at 474. The Commissioner having failed to satisfy this burden, Plaintiff is entitled to remand.

(*Id.*, PageID.730–736; emphasis in original and citations omitted.)

The Commissioner did not file any objections the Magistrate Judge's ruling. (*See* Initial Order, ECF No. 12-10, PageID.740.) On July 10, 2017, the Court adopted the Magistrate Judge's recommendation and remanded Springer's claim to the SSA for further proceedings. (*See id.*)

## E

On remand, the ALJ held another oral hearing on February 22, 2018 (the "Second Hearing").[1] (*See* 2/22/18 Hr'g Tr., ECF No. 12-9, PageID.634–771.) At the Second Hearing, Springer testified about how his pain and mental issues had progressed since he last testified:

- He could drive the 11 miles between his home and his daughter's school without falling asleep. But he had problems with falling asleep while driving if he drove for longer than 20 minutes, and he did not drive any further than the distance to his daughter's school. (*See id.*, PageID.643.)
- He napped "constantly," he could not watch a TV show without falling asleep, and he occasionally fell asleep while eating. (*See id.*, PageID.644.)
- He had difficulty understanding or retaining information that he read or watched. The only thing he read was *Reader's Digest* while going to the bathroom, and he would watch the same TV show every week or month without remembering that he had watched it. (*See id.*, PageID.645.)

---

[1] Springer had filed another claim for disability benefits on January 20, 2016. On remand, the ALJ consolidated Springer's claims into one single claim. (*See* Order of Appeals Council, ECF No. 12-10, PageID.745.)

- He had become increasingly forgetful, and he occasionally forgot to pay his cable, water, or credit card bills. Springer's 22-year-old stepson, who recently moved in with him, helped Springer remember important tasks. (*See id.*, PageID.647, 649.)

- He was working with his doctors to wean himself off opioids. (*See id.*, PageID.646.)

- Before 2017, it would have been too painful for him to do a job where he could sit and stand as needed. (*See id.*, PageID.648–649.)

A VE also testified at the Second Hearing. To guide the VE's testimony, the ALJ presented the VE with an updated hypothetical about an individual of Springer's age, educational level, and work experience, who had the following functional limitations:

> [T]his would be a hypothetical person who's the same age as Mr. Springer who is currently 49, would have been 49 at the time of his date last insured, has the same education, has the same past work experiences, he has the ability to perform the full range – we'll start with a light exertional demand at this time with additional limitations: this person could only occasionally climb stairs, crouch or crawl or kneel or stoop or bend; but he's not able to work near hazards . . . so he's not able to climb any ladders or ropes or scaffolding or work around dangerous moving machinery or unprotected heights so that would include things like no climbing of ladders, ropes, or scaffolding; the work should be low stress and low stress means he's working at his own pace as opposed to at a production rate or where his duties are interdependent with coworkers; and importantly the work should be simple, routine, repetitive work.

(*Id.*, PageID.655.)

The VE testified that the above-described hypothetical individual could not perform Springer's past relevant work as a teacher and a coach. (*See id.*, PageID.655–656.) However, the VE testified that the following jobs were available in the national economy for the hypothetical individual to perform:

- 200,000 light-work jobs as a garment sorter. These jobs could be performed from a seated or standing position. (*See id.*, PageID.656–657.)
- 400,000 light-work jobs as a nut and bolt assembler. (*See id.*, PageID.656.)
- 830,000 light-work jobs as an inspector. (*See id.*)
- 200,000 sedentary-work jobs as a final assembler. These jobs could be performed in a seated or standing position. (*See id.*, PageID.656–657.)
- 450,000 sedentary-work jobs as a nut sorter. These jobs could be performed in a seated or standing position. (*See id.*)
- 200,000 sedentary-work jobs as an assembler. These jobs could be performed in a seated or standing position. (*See id.*)

The VE testified that the hypothetical individual would be *unable* to perform any jobs in the national economy if the hypothetical was amended to add *any one* of the following limitations:

- He needed to take 15-minute breaks to lay down and manage his back pain. (*See id.*, PageID.657.)
- He fell asleep for 20% of an average workday. (*See id.*)
- He required "frequent reminders or redirection to task." (*Id.*, PageID.657–658.)

- He was absent at least twice a month. (*See id.*, PageID.658.)

The VE asserted that most of her testimony was "consistent with and based on the Dictionary of Occupational Titles [(the "DOT")] and the Selected Characteristics of Occupations [(the "SCO")] defined in the revised DOT." (*Id.*, PageID.658.)  But the VE acknowledged that the "information [underlying her opinions] as it relates to the sitting and standing, information as it relates to the need to lie down, information as it relates to time off task, information as it relates to frequent reminders as well as absences [were] all based upon [her] 20 plus years of job placement experience," not information contained in the DOT. (*Id.*)

On examination by Springer's attorney, the VE testified that if the hypothetical individual also needed "to sit six hours that day and stand two hours that day and the next day stand six and sit two," then he could not perform any "light work" jobs that the VE had listed (garment sorter, nut and bolt assembler, or inspector). (*Id.*, PageID.658–659.)  Although a person with such a limitation could perform the "sedentary" positions (final assembler, nut sorter, or assembler), the VE estimated that the number of such positions available in the national economy would be reduced by half. (*See id.*)  And the VE testified that the hypothetical individual could not find any employment if the individual also needed to move around every one to five minutes. (*See id.*)

Springer's attorney also asked the VE about how she estimated the number of jobs in the national economy available for the hypothetical individual. She again acknowledged that the numbers she provided did not come from the DOT, but rather were based upon certain Bureau of Labor Statistics' ("BLS") figures and her professional experience.[2] (*See id.*, PageID.659–660.) She did not have "any data, studies, statistics, [or] forms" to show how she arrived at the job numbers she testified to. (*Id.*, PageID.660.) The VE admitted that the BLS statistics did not differentiate between skilled and unskilled jobs, and she agreed that there was "no way to reproduce the job numbers" that she provided. (*See id.*, PageID.659–660.)

Springer's attorney objected to the VE's testimony: "I have to object . . . based on the fact that there's no reports, data, studies, anything to substantiate the job numbers so I would submit that it's not based on substantial evidence." (*Id.*, PageID.662.) The ALJ did not rule on the attorney's objection during the Second Hearing, but the ALJ said that she would consider Springer's objection and case law at a later date. (*See id.*, PageID.663.)

**F**

On May 1, 2018, the ALJ issued a written decision that again found that Springer was not disabled and not entitled to benefits (the "Second ALJ Decision").

---

[2] The VE, after being questioned by the ALJ, testified that her job estimates were "conservative" estimates and that she had been working as a VE for more than 20 years. (2/22/18 Hr'g Tr., ECF No. 12-9, PageID.661.)

(*See* Second ALJ Decision, ECF No. 12-9, PageID.549–566.)  In the Second ALJ Decision, the ALJ again applied the SSA's required five-step process.

At Step One, the ALJ again found that Springer had not engaged in substantial gainful activity since June 2012. (*See id.*, PageID.551.)  At Step Two, the ALJ concluded that Springer suffered from the following severe impairments:

- Multilevel disc bulging;
- Degenerative disc disease with mild compression deformities of the thoracic spine;
- Lumbar radiculopathy;
- Attention deficit disorder; and
- Major depressive disorder.

(*Id.*, PageID.551–552.)

At Step Three, the ALJ again found that Springer "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (*Id.*, PageID.552–554.)  Thus, the ALJ concluded that Springer was not disabled at this step.

More specifically, the ALJ concluded that Springer's degenerative disc disease of the thoracic spine and lumbar radiculopathy failed to satisfy the severity requirements of Listing 1.04, which concerns disorders of the spine. (*See id.*, PageID.552.)  The ALJ considered an October 2012 MRI of Springer's thoracic

spine, which "indicated diffuse degenerative changes, no disc herniation or spinal deformity, and mild compression deformity at T4." (*Id.*) The ALJ also considered an October 2012 MRI of Springer's lumbar spine, which "indicated L4-5 disc protrusion and small disc bulge at L5-S1." (*Id.*) And the ALJ considered January 2018 EMG/NCV studies of Springer's lower extremities, which "were consistent with L5-S1 radiculopathy, but no peripheral neuropathy." (*Id.*). The ALJ also cited the "objective clinical findings" of Springer's healthcare providers that "consistently indicate good strength in all the extremities, no muscle atrophy, intact sensation, intact reflexes, and normal range of motion of the lumbar spine." (*Id.*)

The ALJ also determined that Springer had the following mental impairments, but that they did not meet or medically equal the severity criteria of Listing 12.04 or 12.11. (*See id.*, PageID.552–554.):

- Moderate limitations in understanding, remembering, or applying information;
- Mild limitations in interacting with others;
- Moderate limitations in his ability to concentrate, persist, or maintain pace; and
- No limitations in his ability to adapt or manage himself.

Prior to Step Four, the ALJ found that Springer had the residual functional capacity to perform "light work" with the following limitations (the "Second RFC"):

> [O]ccasional climbing of stairs, crouching, crawling, kneeling, stooping/bending; avoid workplace hazards such as dangerous, moving machinery and unprotected heights; no climbing ladders, ropes, or scaffolds; low stress work, which is work that is self-paced and not at a production rate and, where the job duties are not interdependent with those of coworkers; and simple, routine, repetitive work.

(*Id.*, PageID.554.)

The ALJ's determination of the Second RFC was based in part on her finding that, although Springer may have back pain and mental disorders, the objective medical evidence did not corroborate the *extent* of his alleged limitations. According to the ALJ, Springer's "medically determinable impairments . . . could reasonably be expected to cause" the symptoms he alleged. (*Id.*, PageID.555.) But the ALJ concluded that Springer's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.*) Instead, "the objective clinical findings do not corroborate the claimant's allegations of debilitating muscle spasms such that he is unable to walk, stand, or sit for more than a few minutes at the time." (*Id.*, PageID.559.) The ALJ also found that Springer's "allegations of medication side effects are not corroborated by the objective medical evidence." (*Id.*) Overall, the ALJ concluded that Springer "is generally doing well, exhibits a normal gait and posture, and exhibits good strength in all the extremities." (*Id.*, PageID.555.)

The ALJ cited the following evidence to support her conclusion that Springer was not as limited by his back pain as he claimed:

- Although Springer was in a skiing accident in 1996, underwent reconstructive surgery on his leg, and participated in ongoing treatment for his back injuries, the fact that he was able to work until June 2012 "undermine[d]" Springer's "allegations of disabling back pain since his injuries in 1996." (*Id.*, PageID.556.)

- On September 14, 2012, Dr. Moosavi (a physiatrist) noted that Springer "exhibited tenderness of the thoracic spine, an antalgic gait, 5/5 strength in the upper extremities, 5/5 strength in the left lower extremity, 4/5 strength in the right lower extremity, and good functional range of motion of the lower extremities." Dr. Moosavi recommended physical therapy for Springer. (*Id.*)

- An October 2, 2012, MRI of Springer's lumbar spine "indicated L4-5 disc protrusion with moderate foraminal stenosis/contact of L4 nerve root, mild degenerative changes at L3-4, and small disc bulge at L5-S1 with no significant foraminal or central canal stenosis." (*Id.*)

- An October 3, 2012, MRI of Springer's thoracic spine "indicated diffuse degenerative changes without evidence of acute fracture, no disc herniation or spinal deformity, and mild compression deformity at T4." (*Id.*)

- On September 4, 2013, a CT myelogram of Springer's lumbar spine indicated "disc protrusion at L4-5, with moderate foraminal stenosis with encroachment on the L4 nerve root." (*Id.*, PageID.557.)

- Throughout 2013, Dr. Eckel (Springer's primary care physician) noted that Springer had a normal range of motion in all major joints and only

occasional acute spasms in the spine, and Dr. Giancarlo (Springer's neurologist) noted that Springer exhibited 5/5 strength in all extremities, intact reflexes, and an antalgic gait. (*See id.*, PageID.556–557.)

- In January 2015, Springer received an epidural injection. (*See id.*, PageID.557.)

- On March 28, 2015, Springer was treated in an emergency room "for an exacerbation of low back pain after bending over and lifting 15-20 pounds." Springer "exhibited some tenderness at the L5-S1 joint." But Springer exhibited "normal range of motion of the cervical spine, normal range of motion of all the extremities, intact reflexes, and intact neurological evaluation." (*See id.*)

- On March 30, 2015, Dr. Moosavi noted that, following Springer's epidural injection, he "had significant improvement in function with the prescribed medications, and he denied side effects to any medications." (*See id.*)

- In May 2015, Springer reported to Dr. Moosavi that his low back pain had improved 50% and he was not experiencing any side effects to medications. (*See id.*, PageID.558.)

- On August 18, 2015, Dr. Giancarlo encouraged Springer "to consider retraining for possible entry to the workforce." (*Id.*)

- On October 27, 2015, Springer characterized his back pain to Dr. Giancarlo as a 5 out of 10. (*See id.*)

- On December 30, 2015, Dr. Voci (a neurologist) noted that Springer "characterized his back pain as only 2-3/10 with the use of medication." (*Id.*)

- Throughout 2015, based on the evaluations of Dr. Giancarlo, Dr. Moosavi, and Dr. Voci, Springer "exhibited no significant tenderness of the thoracic or lumbar spine, normal posture, a normal gait, and was able to stand without difficulty." (*Id.*)

- On May 11, 2016, during a psychological evaluation by Dr. Rudolph, Springer exhibited "a normal gait and an erect posture." (*Id.*, PageID.559.)

- Throughout 2016, Dr. Eckel and Dr. Giancarlo observed that Springer was feeling well, denied side effects to medications, had a normal range of motion of the spine and major joints, had intact reflexes, had no neurological deficits, had a normal posture, had no tenderness of the spine, had normal strength in his extremities, and was able to stand without difficulty. (*See id.*, PageID.558–559.)

- From March 2015 through July 2017, Springer's urologist noted that Springer "exhibited a normal gait." (*See id.*, PageID.559.)

- On January 25, 2017, Dr. Giancarlo noted that Springer "did not complete physical therapy, but that he would complete the exercises at home." (*Id.*)

- On August 14, 2017, Dr. Eckel noted that Springer "denied dyspnea and denied any side effects to medication." (*Id.*)

- Throughout 2017, Dr. Giancarlo noted that Springer had a normal posture, intact reflexes, and a normal gait, and that he could stand without difficulty. (*See id.*)

- On January 15, 2018, EMG/NCV studies of Springer's lower extremities "were consistent with L5-S1 radiculopathy, but not peripheral neuropathy." (*Id.*)

- On January 16, 2018, Dr. Santa Ana (a neurologist) noted that Springer had "some tenderness of the lumbar spine, normal posture, intact reflexes, a normal gait, and was able to stand without difficulty." (*Id.*)

The ALJ also concluded that Springer's allegations of disabling anxiety, depression, and reduced concentration were not fully supported by the objective medical evidence. (*See id.*, PageID.560.) The ALJ cited the following evidence in support of that conclusion:

- On August 31, 2012, Springer sought treatment for an "anxious mood." The evaluating therapist noted that Springer exhibited "intact memory, intact judgment, and intact cognitive functioning." Springer was diagnosed with generalized anxiety disorder, but he failed to follow up with treatment and was discharged from care as of February 28, 2013. According to the ALJ, Springer's "failure to follow up with treatment undermines [his] allegations of disabling anxiety." (*See id.*)
- On September 30, 2013, Springer attended a psychological evaluation conducted by Dr. Mills. Dr. Mills diagnosed Springer with "depressive disorder NOS and generalized anxiety disorder." Dr. Mills noted that Springer, despite his disorder, "was able to get along with others, had good relationships with his family and friends, enjoyed reading, was able to care for his activities of daily living, and was able to drive." Springer also "denied significant memory impairment" and exhibited "intact memory, good calculations, and intact judgment." Dr. Mills concluded that Springer "had adequate ability to interact with others" and "would be able to understand, retain, and follow simple instructions and perform basic routine and tangible tasks." The ALJ gave Dr. Mills' assessment

"significant weight" because it was "based upon a thorough evaluation of [Springer] and is consistent with the evidence as a whole." The ALJ also found that Springer's "allegations of disabling inattention or poor concentration" were inconsistent with him (a) denying to Dr. Mills that he had significant memory impairment, and (b) failing to follow up on his mental health counseling. (*Id.*, PageID.560–561.)

- In October 2013, Dr. Czarnecki (a state-agency psychologist) concluded that Springer "had no more than mild limitation with social functioning, and moderate limitation with concentration, persistence, or pace." The ALJ gave this assessment "significant weight" because it "is consistent with the assessment by Dr. Mills." (*Id.*, PageID.561.)

- On October 3, 2013, Springer began treatment with Dr. Guerrero (a psychiatrist) for anxiety. Springer was prescribed medication and "diagnosed with major expression and dysthymia." (*See id.*, PageID.560)

- In March 2016, Dr. Guerrero again evaluated Springer for complaints of anxiety. Dr. Guerrero noted that he had not seen Springer since January 2014. According to the ALJ, Springer's "failure to follow-up with treatment undermines [his] allegations of disabling anxiety." (*Id.*)

- On May 11, 2016, Springer attended a psychological evaluation conducted by Dr. Rudolph. Springer "drove to the appointment, exhibited adequate grooming and hygiene, and was noted to maintain his activities of daily living." Springer also "exhibited good calculations and reduced serial sevens." Dr. Rudolph diagnosed Springer with "major depressive disorder, single episode, severe." According to the ALJ, Dr. Rudolph's diagnosis was "inconsistent with [Springer's] allegations of disabling forgetfulness such that he forgets appointments and forgets to pay bills. Rather, Dr. Rudolph noted that [Springer] was

22

independent with his activities of daily living, was able to handle his finances, and was able to drive." (*Id.*)

- In June 2016, Dr. Tripp (a state-agency psychologist) concluded that Springer had mild limitations in interacting with others and moderate limitations with concentration, persistence, or pace. The ALJ afforded "significant weight" to Dr. Tripp's assessment because it was "consistent with the record as a whole," as Springer "was consistently noted to be cooperative and exhibited normal mood and affect, such that the claimant had no more than mild difficulty interacting with others." The ALJ found that Dr. Tripp's assessment was consistent with Dr. Rudolph's and Dr. Giancarlo's assessments that Springer had normal attention and concentration. (*Id.*, PageID.561.)

- Throughout 2016 and 2017, Dr. Giancarlo and Dr. Santa Ana noted that Springer exhibited normal attention and concentration. According to the ALJ, Dr. Giancarlo's and Dr. Santa Ana's "clinical findings do not corroborate [Springer's] allegations of disabling forgetfulness." (*Id.*)

The ALJ also declined to afford substantial weight to opinions offered by three of Springer's treating physicians: Dr. Zinkel (a neurologist), Dr. Guerrero (a psychiatrist), and Dr. Eckel (a primary care physician). The ALJ offered the following reasons in support of that decision:

- The ALJ noted that Dr. Zinkel had "opined" on April 9, 2013, that Springer "could not lift more than 10 pounds, and that he could not stand

23

except to transfer to a chair."[3] (*See id.*, PageID.562.)  But Dr. Zinkel also noted that Springer had undergone surgery for his impairments – a fact that Springer denied at the First Hearing.  The ALJ concluded "that the inaccuracy of Dr. Zinkel's statement undermines the credibility of his opinion."  And the ALJ found that Dr. Zinkel's opinion was inconsistent with other diagnostic evaluations of Springer as well as Springer's admission "that he could walk 100 yards without assistance." (*Id.*)

- Dr. Guerrero had "opined that [Springer] was not able to function and needed social security income."  But the ALJ "accord[ed] little weight" to Dr. Guerrero's opinion because "Dr. Guerrero did not treat the claimant for a significant period of time, and therefore, did not establish a longitudinal treatment history with the claimant that would give him a broad perspective on the claimant's condition."  And the ALJ found that Dr. Guerrero's opinion "starkly contrast[ed]" with Springer's "admitted activities of daily living in his function report, and his ability to complete mental status tasks as demonstrated in the consultative evaluation." (*Id.*)

- Dr. Guerrero, Dr. Eckel, Dr. Giancarlo, Dr. Zinkel, and Springer had, at various times throughout Springer's treatment, claimed that Springer

---

[3] There is some confusion in the record about Dr. Zinkel's identity.  The ALJ referred to him as "Dr. Zinkle." (*See* ALJ Opinion, ECF No. 12-9, PageID.562.)  But the document that the ALJ cited to appears to be the notes and correspondence from a Dr. "John L. Zinkel." (*See* Zinkel Documents, ECF No. 12-8, PageID.537–540.)  And the Commissioner attributes this opinion to a Dr. Konst, a neurologist who wrote a letter on February 14, 2013, that contained a similar description of Springer's pain, limitations, and sleepiness as Dr. Zinkel's. (*See* Comm'r Mot. for Summ. J., ECF No. 19, PageID.1492; citing Konst Letter, ECF No. 12-7, PageID.371.)  Because the ALJ refers to Dr. Zinkel's opinion, the key document is written on Dr. Zinkel's letterhead, and the name of this neurologist is not relevant to the ultimate legal issue, the Court will refer to this neurologist as "Dr. Zinkel."

was disabled and could not return to work. But the ALJ determined that "these assessments are given no weight because they are not medical opinions, but an opinion on the ultimate issue of disability, which is an issue reserved solely to the Commissioner." (*Id.*)

- Springer had been assessed with Global Assessment of Function ("GAF") ratings of 50 and 70 throughout his mental treatment. But the ALJ determined that Springer's GAF scores "do not provide a reliable longitudinal picture of the claimant's mental functioning for disability analysis" because they "represent a particular clinician's subjective evaluation of a single point in time and are only given limited weight because they are only 'snapshot' opinions about an individual's level of functioning." (*Id.*)

- On October 7, 2013, Dr. Eckel stated that Springer had "thoracic and lumbar muscle spasms, excessive daytime sleepiness from pain medication, depression, and anxiety." Dr. Eckel also noted that Springer "would be off task more than 25% of the workday, was incapable of low stress, was limited to walking less than one block, sitting and standing for 2 hours total in a day, unscheduled breaks, lifting less than 10 pounds, postural limitations, and would miss more than 4 days of work per month." But the ALJ gave Dr. Eckel's assessment "little weight" because it was "inconsistent with the record as a whole." In particular, the ALJ found that the medical evidence did not corroborate the allegations of excessive sleepiness from pain medications, and Dr. Eckel did not note Springer experiencing spasms during other evaluations. (*Id.*)

- On January 2, 2015, Dr. Eckel stated that Springer had "multilevel thoracic spine fractures, chronic pain, fatigue, numbness in the lower extremities, and anxiety," and Dr. Eckel limited Springer to, among other

things, "walking less than one block, sitting and standing for only 5 minutes at a time, no twisting, [and] rarely stooping or crouching." Dr. Eckel concluded that Springer "was incapable of low stress work, would be off task more than 25% of the workday, and would miss more than 4 days of work per month." But the ALJ again gave Dr. Eckel's assessment "little weight" because the ALJ viewed it as inconsistent with the record. In particular, the ALJ noted that Dr. Eckel's assessment was contradicted by (a) Dr. Moosavi's assessment on May 20, 2015, that Springer reported a 50% improvement in his pain and denied any side effects to medication, and (b) Dr. Giancarlo's assessment in June 2015 that Springer "had no tenderness of the cervical spine, thoracic spine, or lumbar spine, and normal range of motion of the spine." (*Id.*, PageID.563.)

- On August 17, 2017, Dr. Eckel reported that Springer had "chronic thoracic spine pain, severe depression, and characterize[s] the pain as 10/10." Dr. Eckel concluded that Springer "would be off task 25% or more of the workday, was incapable of low stress, was unable to walk more than one block, was limited to sitting and standing for less than 2/8 hours, would need a cane for walking, [] was limited to no lifting over 10 pounds. . . . [and] would miss more than 4 days of work per month." The ALJ gave Dr. Eckel's assessment "no weight" because it was inconsistent with the record. The ALJ noted that "[t]hroughout 2016 and 2017, [Springer] consistently characterized his pain as 3-4/10, which is significantly different than the assessment by Dr. Eckel characterizing [Springer's] pain as 10/10. Moreover, [Springer] consistently exhibits a normal gait and is able to stand without difficulty, and there is no evidence indicating that [Springer] was using a cane." The ALJ also

found that Springer's intact reflexes, coordination, strength, and normal posture meant that "there is no objective medical evidence" for the limitations suggested by Dr. Eckel. (*Id.*)

At Step Four, based on the Second RFC, the ALJ concluded that Springer was unable to perform any of his past relevant work as a teacher or a coach. (*See id.*, PageID.564.)

Finally, at Step Five, the ALJ concluded that Springer "was capable of making a successful adjustment to other work that existed in significant numbers in the national economy" and was thus not disabled. (*Id.*) In support of that conclusion, the ALJ relied upon the VE's testimony to which Springer had objected. The ALJ found that there was no evidence that the VE's testimony was "in conflict with information provided in the [DOT] and its companion publication the [SOC]." (*Id.*, PageID.565.) The ALJ noted that the DOT did not "address whether jobs allow flexibility to be performed either seated or standing, at the option of the worker, the attendance policies/practices of employers, employer tolerance for an individual being off-task during the work day, whether opportunities exist to lie down, the impact of the need for reminders, and the numbers of existing jobs." (*Id.*) And the ALJ found that the VE's "testimony pertaining to these matters was based on her professional knowledge and experience" and was "persuasive and well supported." (*Id.*)

## G

Springer filed this action challenging the denial of benefits on August 29, 2018. (*See* Compl., ECF No. 1.)  On March 4, 2019, Springer filed a Motion for Summary Judgment, arguing that the Second ALJ Decision was not supported by substantial evidence, was tainted by legal error, and should be reversed and remanded. (*See* Springer Mot. for Summ. J., ECF No. 16.)  On April 15, 2019, the Commissioner also filed a Motion for Summary Judgment, arguing that the Court should affirm the ALJ's decision. (*See* Comm'r Mot. for Summ. J., ECF No. 19.) The Court concludes that it may decide the motions without holding a hearing. *See* L.R. 7.1(f)(2).

## II

In reviewing a disability determination by an ALJ, the Court is limited to determining whether those findings are "supported by substantial evidence" and whether the ALJ "applied the correct legal criteria." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745–46 (6th Cir. 2007); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human*

*Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). "An ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quotation omitted).

## III

Springer first moves for relief based on errors related to the ALJ's determination of the Second RFC. More specifically, Springer challenges: (1) the ALJ's decision to discount Springer's statements concerning the intensity and limiting effect of his physical impairments (*see* Second ALJ Decision, ECF No. 12-9, PageID.555, 559–560); (2) the ALJ's decision to discount Springer's statements concerning the intensity and limiting effect of his mental impairments (*see id.*, PageID.560); and (3) the ALJ's decision to afford little weight to opinions offered by three of Springer's treating physicians (*see id.*, PageID.562–563.) None of these aspects of the Second ALJ Decision amount to reversible error.

## A

The Court begins with the ALJ's determination to discount Springer's statements concerning his physical impairments. Springer attacks that conclusion on four grounds. None persuade the Court that Springer is entitled to relief.

First, Springer argues that ALJ wrongly discounted his statements concerning the intensity and limiting effect of his physical impairments on the basis that the

statements were not "fully corroborated" by the "objective medical evidence." (*Id.*, PageID.555.)   Springer insists that his statements did not have to be "fully corroborated" by objective medical evidence; rather, he insists that "statements regarding the intensity, persistence and limiting effects of symptoms [should] not be disregarded *solely* because the objective medical evidence does not substantiate the degree of impairment related symptoms alleged by the individual." (Springer Mot. for Summ. J., ECF No. 16, PageID.1445–1446; emphasis added; citing Social Security Ruling 16-3p, 2016 WL 1119029, at \*5.)   But the ALJ did not reject Springer's statements based *solely* upon a lack of corroborating medical evidence. On the contrary, she also identified additional statements by Springer and notes of his treating physicians that contradicted Springer's claims that his physical impairments were severe and debilitating.   For instance, she relied in part on Springer's subjective reports to doctors about the extent of his pain, including the fact that Springer characterized his back pain as a "5 out of 10," and only "2-3/10 with the use of medication," during visits to Dr. Giancarlo and Dr. Voci in 2015. (Second ALJ Decision, ECF No. 12-9, PageID.558.)  The ALJ thus did not make the error of rejecting Springer's report concerning the impact of his physical impairments based solely upon a lack of corroborating objective medical evidence.

Second, Springer says the ALJ erred when she found that his pain was not as limiting as he claimed in part because his doctors had encouraged Springer to

consider retraining so that he could reenter the workforce. (*See id.*, PageID.558.)
The ALJ noted that, on August 18, 2015, Dr. Giancarlo encouraged Springer "to
consider retraining for possible entry [into the] workforce." (8/18/15 Dr. Giancarlo
Report, ECF No. 12-14, PageID.1022; *see also* 12/30/15 Dr. Voci Report, ECF No.
14, PageID.1027 (noting similar recommendation).) Springer argues that the ALJ
ignored the full context in which his doctors made their recommendations and
instead "cherry-picked" portions of the record. (Springer Mot. for Summ. J., ECF
No. 16, PageID.1447.) Springer emphasizes that, after Dr. Giancarlo made his
recommendation, Springer reported back to Dr. Giancarlo on October 27, 2015, that
he had "tried to increase activity to see if [he] could re-enter [the] workforce," but
the "increased activity 'crushed' him." (10/27/15 Dr. Giancarlo Report, ECF No. 12-
14, PageID.1032.)

There was substantial evidence, however, for the ALJ to conclude that
Springer was not as physically impaired as he claimed based, in part, on Dr.
Giancarlo's recommendation. Notably, after Springer reported being "crushed" by
his increased activity, Dr. Giancarlo *reduced* Springer's Norco prescription for pain
and Adderall prescription for tiredness. (*See id.*) The ALJ could reasonably infer
from Dr. Giancarlo's reduction that Springer's pain after his increased activity was
not as severe as Springer self-reported. And the ALJ cited to several 2016 and 2017
reports from Springer's doctors, including Dr. Eckel and Dr. Giancarlo, that

"consistently noted" that Springer "indicated that he was feeling well and that [Springer] denied side effects to medication." (Second ALJ Decision, ECF No. 12-9, PageID.559.) As the ALJ noted, these reports of Springer's improvement – after Springer claimed he was "crushed" by his increased activity – were "consistent with the assessment by Dr. Giancarlo that [Springer] was capable of training to reenter the workforce." (*Id.*) The ALJ did not improperly cherry pick evidence, but rather properly weighed Springer's claims against other evidence in the record. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) ("[W]e see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.").

Third, Springer argues that the ALJ erred when she found that Springer's allegations of disabling pain stemming from his 1996 skiing accident were undermined by the fact that Springer continued to work until 2012. (*See* Springer Mot. for Summ. J., ECF No. 16, PageID.1450.) Springer argues that the fact that he worked until 2012 was not inconsistent with him experiencing progressively worse pain since 1996. (*See id.*) And Springer contends that his extensive work history and attempts to continue working despite his disability support his credibility. (*See id.*; citing *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 798 (6th Cir. 2009).) The points Springer makes here are fair ones. But the fact that Springer's work history could be seen differently than the ALJ viewed it does not mean that the ALJ's

view of that history – as undermining Springer's claim concerning the limiting effect of his pain – was unreasonable. Rather, as the Commissioner notes, the ALJ could reasonably infer that Springer was able to work despite his pain. (*See* Comm'r Mot. for Summ. J., ECF No. 19, PageID.1482.) Moreover, contrary to Springer's contention, a claimant is not entitled to "substantial credibility" solely because of the claimant's "exemplary work" history. *Sorrell v. Comm'r of Soc. Sec.*, 656 F. App'x 162, 174 (6th Cir. 2016). The ALJ's treatment of Springer's work history did not taint her conclusions concerning the impact of Springer's physical impairments.

Fourth, Springer argues that the ALJ ignored or misstated some of the medical evidence when she concluded that that evidence did not corroborate Springer's allegations about the extent of his pain. Springer cites to the following evidence, among other things, that, he says, supports his statements about the amount of pain he was in:

- Springer was diagnosed with chronic pain syndrome, which can be difficult to objectively quantify. (*See* Springer Mot. for Summ. J., ECF No. 16, PageID.1449; citing *Massengill v. Shenandoah Life Ins. Co.*, 459 F. Supp. 2d 656, 671 ("[T]he Court recognizes that chronic pain syndrome . . . [is] difficult to diagnose and not conducive to objective medical testing.").)
- Springer's lumbar radiculopathy was consistent with him experiencing pain. (*See id.*)

33

- Springer had previously used a cane for his pain and stability issues. (*See id.*, PageID.1451.)

- Springer was in so much pain in 2012 that he was medicated with Fentanyl patches. (*See id.*)

- Springer's Lyrica prescription had to be adjusted due to side effects – increased drowsiness – reported by Springer. (*See id.*, PageID.1452; citing 6/23/14 Dr. Giancarlo Report, ECF No. 12-16, PageID.1423.)

- Springer's "50% improvement" in pain occurred after he received an epidural injection, and he "reinjured himself and did not improve" after the injection. (*See id.*, PageID.1453.)

Springer's focus on this evidence is reasonable. Indeed, a different ALJ might reasonably have determined that this evidence, along with other evidence supporting Springer's statements, warranted the conclusion that Springer's pain was as debilitating as he claimed. But the fact that the ALJ here did not treat this evidence in that manner does not mean that her decision was unreasonable and/or unsupported by substantial evidence. The ALJ cited a substantial amount of evidence to support her conclusions concerning the impact if Springer's pain, including medical records from Dr. Moosavi, Dr. Eckel, and Dr. Giancarlo, suggesting that Springer was not as limited in motion or experiencing as much pain or side effects as he claimed. (*See* Second ALJ Decision, ECF No. 12-9, PageID.556–559.) The ALJ was "required to . . . provide specific reasons for crediting or discrediting a claimant's testimony," but the ALJ was "not required to analyze the relevance of each piece of evidence

individually." *Bailey v. Comm'r of Soc. Sec.*, 413 F. App'x 853, 855 (6th Cir. 2011). Here, the ALJ "cited to evidence and fully explained the reasons" for ruling that the extent of Springer's pain was not as extreme as Springer alleged, and the Court sees no basis to disturb that decision.

For all of these reasons, Springer is not entitled to relief based on his argument that the ALJ wrongly discounted his statements about his physical impairments.

## B

The Court next considers the ALJ's determination to discount Springer's statements concerning his mental impairments. Springer attacks that conclusion on two grounds. Neither persuades the Court that the ALJ erred.

First, Springer contends that the ALJ improperly concluded that his failure to follow up with his mental health treatment undermined his claim of disabling anxiety. (*See* Springer Mot. for Summ. J., ECF No. 16, PageID.1454–1456.) Springer argues that his failure could be a symptom of his severe anxiety rather than a sign he was not experiencing disabling anxiety. (*See id.*, PageID.1454; citing *White*, 572 F.3d at 283–84 ("For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself.").) It certainly is possible that a claimant's failure to seek or continue mental health treatment could be a symptom of the claimant's anxiety rather than an indication that the claimant's anxiety is not severe. However, Springer did not introduce any evidence that his

anxiety prevented him from following through with mental health treatment – or that it played any role in his failure to seek such treatment. In the absence of such evidence, it was not unreasonable for the ALJ to conclude that Springer's failure to continue in mental health treatment weighed against his claim that he suffered disabling anxiety. Furthermore, Springer's failure to seek treatment was only one of several factors supporting the ALJ's conclusion that Springer's mental disorders were not disabling. (*See* Second ALJ Decision, ECF No. 12-9, PageID.560–561.) For these reasons, the ALJ's view of Springer's failure to obtain mental health treatment does not warrant relief.

Second, Springer argues that the ALJ ignored or misstated evidence regarding the disabling nature of his mental disorders. In particular, Springer highlights that:

- Springer was diagnosed with a depressive disorder and a GAF score of 50. (Springer Mot. for Summ. J., ECF No. 16, PageID.1454.) "A GAF score between 41 and 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Grisier v. Comm'r of Soc. Sec.*, 721 F. App'x 473, 475 n.1 (6th Cir. 2018) (quotation omitted).
- Dr. Zinkel advised against back surgery for Springer due to concerns "that he wouldn't heal successfully due to all the additional stressors in his personal context." (11/16/2012 Dr. Zinkel Letter, ECF No. 12-8, PageID.539.)

- Some evaluations of Springer noted that his judgment was "marginal to impaired," he suffered from "impaired or abnormal memory deficits," and he appeared to have "major" or "severe" depression. (Springer Mot. for Summ. J., ECF No. 16, PageID.1455.)

An ALJ might reasonably have weighed the evidence cited by Springer and concluded that his mental disorders were disabling. But that does not mean that the ALJ's decision here was unreasonable or that it was unsupported by substantial evidence. Indeed, the ALJ cited substantial evidence to support her conclusion that Springer's mental disorders were not disabling. (*See* Second ALJ Decision, ECF No. 12-9, PageID.560–561.) For example, although the ALJ acknowledged that Dr. Mills diagnosed Springer with a depressive disorder and generalized anxiety on September 30, 2013, she also noted that Dr. Mills observed that Springer could still get along well with others, was able to attend to his daily chores, had an intact memory and judgment, and could perform basic routine tasks. (*See id.*, PageID.560–561.) Similarly, the ALJ cited Dr. Tripp's June 2016 evaluation of Springer, in which Dr. Tripp noted that Springer's mental disorders presented only "moderate" or "mild" limitations. (*Id.*, PageID.561.) Accordingly, the ALJ "provide[d] specific reasons for crediting or discrediting" Springer's testimony and "cited to evidence and fully explained the reasons" why she concluded that – although Springer suffered from several mental disorders – the disorders were not disabling. *Bailey*, 413 F. App'x at 855.

For all of these reasons, Springer is not entitled to relief based on his argument that the ALJ wrongly discounted his statements about his mental impairments.

## C

The Court next turns to the ALJ's determination to accord little or no weight to three of Springer's treating physicians. Springer argues that the ALJ did not provide good reasons for this ruling. The Court disagrees.

Under the regulations that govern Springer's claim for benefits, the ALJ must accord "controlling weight" to the opinion of Springer's treating physicians if the opinions are (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) are not "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).[4] An ALJ must provide "good reasons" for discounting a treating physician's opinion, and those reasons must be supported by specific evidence in the record. *Id.*; *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).

Springer argues that the ALJ improperly gave little or no weight to some of the medical opinions of Dr. Eckel, Dr. Zinkel, and Dr. Guerrero. In particular, Springer argues that the ALJ did not give good reasons for discounting: Dr. Eckel's 2013, 2015, and 2017 opinions that Springer was suffering from extreme pain and

---

[4] This rule only applies to claims filed before March 27, 2017. For claims filed on or after March 27, 2017, 20 C.F.R. § 404.1520c applies instead.

sleepiness as a side effect of medications; Dr. Zinkel's April 9, 2013, opinion that Springer was unable to lift more than ten pounds; and Dr. Guerrero's opinion that Springer was not able to function and needed social security income. (*See* Springer Mot. for Summ. J., ECF No. 16, PageID.1457–1458, 1460–1464.)

But the ALJ cited to specific, substantial evidence showing that these opinions were inconsistent with the medical record. For instance, the ALJ gave little weight to Dr. Eckel's opinion because Dr. Eckel's characterization of Springer's pain was inconsistent with other reports (by doctors and by Springer) of Springer's pain. (*See* Second ALJ Decision, ECF No. 12-9, PageID.562–563.) And, contrary to Dr. Eckel's reports, at other evaluations Springer and his doctors noted that he was not experiencing sleepiness as a side effect to his medications. (*See id.*) The ALJ also cited at least two reasons to disregard Dr. Zinkel's opinion: Dr. Zinkel said Springer had surgery when he had not, and other evidence in the record suggested that Springer could lift more than 10 pounds. (*See id.*, PageID.562.) And the ALJ gave little weight to Dr. Guerrero's opinion that Springer was "not able to function" because Dr. Guerrero had "not established a longitudinal treatment history" with Springer and Springer's function report and consultative evaluations "starkly contrast[ed]" with Dr. Guerrero's opinion. (*Id.*) The ALJ therefore followed federal regulations by providing "good reasons" – supported by specific evidence – to

disregard these doctors' opinions as inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 404.1527(c)(2).

For all of these reasons, Springer is not entitled to relief based on his argument that the ALJ wrongly discounted the opinions of his treating physicians.

## IV

Springer next argues that the ALJ committed reversible error at Step Five of the SSA's sequential analysis. As described above, at that step, the ALJ found – based on the VE's testimony – that "there were jobs that existed in significant numbers in the national economy that [Springer] could have performed." (Second ALJ Decision, ECF No. 12-9, PageID.564–565.) Springer argues that this finding was not supported by substantial evidence because the ALJ failed to identify a sufficient basis for concluding that important aspects of the VE testimony were reliable. (*See* Springer Mot. for Summ. J., ECF No. 16, PageID.1464–1466.) The Court agrees.

## A

At Step Five, the ALJ determines whether the claimant, based on the claimant's residual functional capacity and vocational factors (such as age, education, and work experience), can "make an adjustment to other work." 20 C.F.R. § 404.1520(g)(1). Although the claimant "bears the burden of proof during the first four steps, . . . the burden shifts to the Commissioner at [S]tep [F]ive." *Staymate v.*

*Comm'r of Soc. Sec.*, 681 F. App'x 462, 469 (6th Cir. 2017) (quotation omitted).  At

Step Five, "the Commissioner must identify a significant number of jobs in the

economy that accommodate the claimant's residual functional capacity and

vocational profile." *Id.* (quotation omitted).

At Step Five, the ALJ may "take administrative notice of reliable job

information available from various governmental and other publications." 20 C.F.R.

§ 404.1566(d).  The DOT is one such publication upon which the ALJ may rely. *See*

*Henderson v. Saul*, No. 17-2846, 2019 WL 5549907, at *7 (D.D.C. Oct. 28, 2019).

The ALJ may also "seek the views of [a VE]," who may present evidence that

includes information from outside the DOT, including "other reliable publications,

information obtained directly from employers, or from a VE's . . . experience in job

placement or career counseling." *Id.* (quoting SSR 00-4p).

A VE's testimony, standing alone, may constitute "substantial evidence"

sufficient to support an ALJ's finding that there are a significant numbers of jobs in

the national economy that a claimant can perform. *See Biestek v. Berryhill*, 139 S.

Ct. 1148, 1157 (2019).  But a VE's testimony amounts to "substantial evidence"

only where it "has sufficient indicia of reliability to support a conclusion about

whether an applicant could find work." *Id.*

The Supreme Court has declined to adopt categorical rules concerning how to

assess the reliability of a VE's testimony.  Instead, the Supreme Court has held that

the reliability of VE testimony must be assessed on a "case-by-case" basis that "takes into account all features of the [VE's] testimony, as well as the rest of the administrative record." *Id.* A claimant may "probe the strength" of a VE's testimony by, among other things, "asking [the VE] about (for example) her sources and methods – where she got the information at issue and how she analyzed it and derived her conclusions." *Id.* Based upon the VE's answers to these questions and the remainder of the VE's testimony, an ALJ must determine whether the VE has offered a "reasoned and principled explanation" supporting the opinion that the claimant may perform a significant number of jobs in the national economy. *Chavez v. Berryhill*, 895 F.3d 962, 969–70 (7th Cir. 2018).[5]

Where an ALJ relies upon a VE's testimony, the ALJ "must build an accurate and logical bridge from [that] evidence to [the ALJ's] conclusion to afford a reviewing court the opportunity to provide the claimant with meaningful judicial review." *Henderson*, 2019 WL 5549907, at *6 (quotation omitted). Stated another way, where an applicant objects to the reliability of a VE's testimony, the ALJ must "meaningfully explain why [she] relied upon the VE . . . ." *Id.* (collecting cases).

---

[5] Although the Supreme Court in *Biestek* rejected the Seventh Circuit's categorical rules concerning how to determine the reliability of a VE's testimony, the Supreme Court cited *Chavez* with approval. *See Biestek*, 139 S. Ct. at 1156–57.

**B**

At the Second Hearing, Springer raised substantial questions concerning the reliability of the VE's testimony. And in the Second ALJ Decision, the ALJ failed to adequately explain why she overruled those objections and found the VE's testimony reliable.

As noted above, the VE testified at the Second Hearing that a person with Springer's Second RFC could perform the following jobs: garment sorter (DOT 222.687-014), with 200,000 such jobs existing in the national economy; nut and bolt assembler (DOT 929.587-010), with 400,000 such jobs existing in the national economy; and inspector (DOT 784.687-042), with 830,000 such jobs existing in the national economy. (*See* 2/22/18 Hr'g Tr., ECF No. 12-9, PageID.656.) On cross-examination by Springer's attorney, the VE said that she developed her opinion about the number of available positions based on unidentified information from the "Bureau of Labor Statistics" and her "experience in job placement." (*Id.*, PageID.659–660.) But she was unable to offer a calculation or even a chain of reasoning showing how she applied her experience to the statistics to arrive at the proposed job numbers:

> Question: [I]n terms of the job numbers, does the DOT provide job numbers?
>
> Answer: As far as the numbers that I cited?
>
> Question: Correct.

Answer: No, that was based upon the Bureau of Labor and Statistics.

Question: Okay. So in terms of the testimony for those particular DOTs then, how do you get to those specific – those job numbers for those specific DOTs that you provided?

Answer: That would just be again based upon the Bureau of Labor Statistics as well as my experience in job placement.

Question: So is there any – do you have any data, studies, statistics, forms to show how to get to those specific job numbers?

Answer: No, I do not. That again is just based upon my work experience as well as the Bureau of Labor Statistics.

Question: So if I asked you to explain I guess mathematically how to get from the BLS numbers plus experience to the job numbers you provided, would you be able to do that?

Answer: Again, I would just indicate that it's based upon my experience as well as the information through the Bureau of Labor Statistics.

Question: Okay. And then the Bureau of Labor Statistics though isn't giving nut sorter, DOT, and the specific jobs just to clarify?

Answer: That is correct.

Question: So –

Answer: It looks at a whole segment of – of jobs, but again I'm looking at also my experience.

Question: And does the Bureau of Labor Statistics differentiate between SVP 2 versus SVP 6, for example, or unskilled and skilled jobs?

Answer: No.

Question: So other than – so there's no way to reproduce the job numbers that you're providing other than your testimony?

Answer: Correct.

(*Id.*, PageID.659–661.)

Despite the VE's inability to explain her reasoning process, the ALJ accepted her testimony concerning the numbers of each job in the national economy:

> In accordance with SSR 00-04p, the undersigned has carefully considered the testimony of the vocational expert and finds there is no evidence to show that it is in conflict with information provided in the *Dictionary of Occupational Titles* and its companion publication the *Selected Characteristics of Occupations*. In this regard, the vocational expert herself indicated that her testimony was consistent with the information contained in these publications but further explained that these publications do not address whether jobs allow flexibility to be performed either seated or standing, at the option of the worker, the attendance policies/practices of employers, employer tolerance for an individual being off-task during the work day, whether opportunities exist to lie down, the impact of the need for reminders, and the numbers of existing jobs. According to the vocational expert, her testimony pertaining to these matters was based on her professional knowledge and experience so that it was not inconsistent with these publications. In light of this explanation, the undersigned finds the vocational expert's testimony to be persuasive and well supported, and in

> compliance with the requirements of SSR 00-4p, and
> accepts this testimony.

(Second ALJ Decision, ECF No. 12-9, PageID.565)

This explanation by the ALJ does not justify her finding that the VE's job number estimates were reliable. First, the ALJ's statement that the job number estimates were reliable because they were "not inconsistent with" the DOT and the SCO is a non sequitur. The VE explained in her testimony that those publications do not address the numbers of positions available in the economy. (*See* 2/22/18 Hr'g Tr., ECF No. 12-9, PageID.658.) The fact that the VE's job estimates do not conflict with publications that say nothing about the number of available jobs does not make the estimates reliable. Second, the ALJ did not explain why the VE's experience rendered her job number estimates reliable despite the fact that the VE did not explain how that experience allowed her to reasonably extrapolate from generalized BLS statistics – that were not broken down by specific position – to the specific job estimates she provided. Simply put, the ALJ failed to provide a "logical bridge" between the VE's experience and the BLS statistics, on one hand, and the ALJ's conclusion that significant jobs for Springer existed in the national economy, on the other hand. *Henderson*, 2019 WL 5549907, at *7.

Without such a bridge or other explanation by the ALJ concerning why she found the VE's experience-based opinion concerning the number of jobs to be

reliable, this Court cannot meaningfully review the ALJ's finding of reliability. And for that reason, a remand is necessary. As the Court in *Henderson* explained:

> In [some] circumstances, the ALJ's decision to rely on a VE based solely on her expertise may present no issue. *See, e.g.*, *Bryant v. Comm'r of Soc. Sec.*, 451 F. App'x 838, 839 (11th Cir. 2012) ("The Social Security regulations provide that an ALJ may rely on a VE's knowledge and expertise, and they do not require a VE produce detailed reports or statistics in support of her testimony."). But in this case, where there were on-the-record objections questioning the reliability of the VE's methodology, that decision effectively precludes meaningful judicial review. Ultimately, the ALJ must develop the record and provide a sufficient bridge from the record to the decision so that a reviewing court can determine whether his reliance on the VE was supported by substantial evidence. Failure to do so is cause for remand. *See Nunley v. Berryhill*, No. CV H-17-0072, 2018 WL 1167700, at *9 (S.D. Tex. Feb. 14, 2018) (recommending remand because ALJ failed to "develop the record on the reliability of the VE's testimony" or provide "specific findings on the reliability of either SkillTRAN or the VE's job-incidence testimony to fulfill the Commissioner's step-five burden"), *report and recommendation adopted sub nom. Nunley v. Colvin*, No. CV H-17-00072, 2018 WL 1122679 (S.D. Tex. Mar. 1, 2018); *Pedone v. Berryhill*, No. 16-CV-02767-STV, 2018 WL 460063, at *8 (D. Colo. Jan. 18, 2018) (finding that remand was appropriate because ALJ failed to develop record by questioning VE about SkillTRAN's reliability based on post-hearing objections and further failed to provide sufficient reasoning for meaningful review); *Russell v. Berryhill*, No. 16-CV-1251-JPG-CJP, 2017 WL 3704354, at *6 (S.D. Ill. Aug. 28, 2017) (remanding case because ALJ failed to develop record on why VE's testimony was reliable or provide reasoning in decision or response to claimant's objections).

> Because the ALJ failed to do so here, this case must be
> remanded for rehearing. The Court's remand is narrow and
> limited only to the step five analysis of whether there is
> other work that Mr. Henderson could perform.

*Id.* at *9.

As in *Henderson*, this Court concludes that a remand for rehearing is necessary here for the limited purpose of conducting another Step Five analysis. At the rehearing, if the VE relies upon her experience and BLS statistics to support an opinion concerning the number of available jobs in the national economy, the VE shall explain how her experience informs her opinion and shall explain her reasoning process. And if the ALJ accepts the VE's experience-based opinion, the ALJ shall offer a sufficient "logical bridge" between the VE's testimony and her (the ALJ's) finding of reliability to allow meaningful judicial review.

## V

For the reasons stated above, **IT IS HEREBY ORDERED** that the motions for summary judgment by Springer and the Commissioner are resolved as follows:

- Springer's Motion for Summary Judgment (ECF No. 16) is **GRANTED IN PART** to the extent that it seeks a remand. Springer's motion is **DENIED** in all other respects.

- The Commissioner's Motion for Summary Judgment (ECF No. 19) is **DENIED**.

- Pursuant to sentence four of 42 U.S.C. § 405(g), this matter is **REMANDED** for further proceedings consistent with this Opinion and Order.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  March 31, 2020


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 31, 2020, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764